Filed 3/12/20

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>    Respondent;<br><br>ALVIN QUARLES,<br><br>    Real Party in Interest. | D076494<br><br>(Super. Ct. No. MH109364)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN THE JUDGMENT |

THE COURT:

The petition for rehearing is denied.  However, in light of some of the issues raised in the petition, we shall modify the subject opinion.  It is ordered that the opinion filed on February 24, 2020, be modified as follows:

1.     On page 3, second paragraph, last sentence, the words "to life" are omitted. It should read as follows:

"The court sentenced him to prison for 50 years."

2.     On page 19, at the end of the first sentence, add the following footnote, which will require renumbering of all subsequent footnotes:

In *Collins*, *supra*, 110 Cal.App.4th 340, we summarized the SVPA as it existed at that time. The quoted language was from section 6608, subdivision (d). After subsequent amendments to the SVPA, the quoted language currently can be found in subdivision (g) of section 6608. The change in the labeling of the subdivision does not impact our analysis here.

3. On page 26, a new paragraph is added before Part II of the opinion and footnote 8 is moved to the end of the new paragraph. It should read as follows:

In response to the original opinion we issued, Quarles filed a petition for rehearing. In it, he argued, among other things, that we are creating a new, unconstitutional standard by which an SVP must prove he is "no danger" to the public if released. Further, Quarles claims that we inappropriately rely on *Karsai*, *supra*, 213 Cal.App.4th 774 to create this standard. Not so. We are not creating a new standard of proof for SVP's. Rather, our approach here is much more modest. We simply conclude that the superior court applied the incorrect standard to Quarles's petition for conditional release by focusing too much on the least restrictive setting in which to place Quarles. We are concerned that the superior court, in taking that approach, did not appropriately focus on: (1) Quarles's diagnosed mental disorder, (2) whether he was likely to reoffend, and (3) if the public would be adequately protected upon Quarles's conditional release. Our analysis and conclusion here does not modify whatsoever the criteria to be reviewed under the SVPA.

HUFFMAN, Acting P. J.

Copies to: All parties

2

Filed 2/24/20

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>        Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>        Respondent;<br><br>ALVIN QUARLES,<br><br>        Real Party in Interest. | D076494<br><br><br><br>(Super. Ct. No. MH109364) |

ORIGINAL PROCEEDINGS in mandate challenging an order of the Superior Court of San Diego County, David M. Gill, Judge. Relief granted in part.

Summer Stephan, District Attorney, Mark A. Amador, Linh Lam, and Samantha Begovich, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

---

[*]     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part II.

Angela Bartosik, Chief Deputy Primary Public Defender, Euketa Oliver, Deputy Public Defender, for Real Party in Interest.

The Sexually Violent Predator Act (SVPA; Welf. & Inst. Code, § 6600 et seq.)[1] provides that, under certain circumstances, a person who has been civilly committed as a sexually violent predator (SVP) can be conditionally released into the community under a program of outpatient supervision and treatment. (See §§ 6608–6609.3.) In June 2018, the superior court determined that Alvin Quarles, who had been committed as an SVP since 2014, should be conditionally released. The People unsuccessfully brought a motion for reconsideration of that order.

In this mandamus proceeding, the People seek a writ of mandate to prohibit Quarles's conditional release. To this end, they contend: (1) the superior court misinterpreted the law and thus erred in ordering Quarles's conditional release; (2) substantial evidence supports Quarles's continued confinement because he remains dangerous and is likely to reoffend; (3) exclusion of certain polygraph evidence was error; and (4) all proceedings relating to Quarles's petition to be conditionally released should have been open to the public.

On the record before us, we are concerned whether the superior court applied the correct legal standard in granting Quarles's petition to be conditionally released. Because of the significance of conditionally releasing an SVP back into the community (especially

---

[1]     Statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

one with a criminal history like Quarles's), we grant some of the requested relief and order the superior court to hold a new trial to determine whether Quarles should be conditionally released under the correct legal standard. We determine the other issues the People raise in their petition are without merit and deny the requested relief as to those issues accordingly.

## FACTUAL AND PROCEDURAL BACKGROUND

The media dubbed Quarles the "Bolder than Most" rapist based on his string of violent rapes during the 1980's. Quarles was arrested and taken into custody on February 22, 1988. Pursuant to a plea agreement entered on February 6, 1989, Quarles ultimately pled guilty to four counts of rape while armed with a knife, six counts of residential burglary, and two counts of robbery. The court sentenced him to prison for 50 years to life.

Quarles's crimes were odious and shocking. Below is a summary of some his offenses.

June 9, 1985, and April 25, 1986: On June 9, 1985, the victim, Diane, awoke to find Quarles standing in her bedroom holding a knife. He told her to be quiet and undress. He digitally penetrated her vagina, orally copulated her, and forced her to orally copulate him twice. Apparently unsatisfied, he told her, "This isn't gonna work. I want to fuck you." After suggesting they engage in anal sex, she told him she had herpes and showed him a yeast medication, after which he left. For this crime, he was convicted of burglary as part of his plea agreement.

3

On April 25, 1986, Quarles returned to Diane's residence, where she awoke to find him in her bedroom holding a knife. He told her he returned because he was angry that she called the police after the previous assault. He ordered her outside and instructed her to climb a fence into an alley, which she was unable to do even with his help. He then led her back into her house and stole $180 from her wallet. As part of his plea agreement, Quarles was convicted of burglary for these actions.

June 3, 1986: Quarles approached Michelle, who was a stranger sitting in a truck outside a bar. Quarles held a sledgehammer near her face. He asked her for her money and then offered to pay her for sex. She declined. After pulling her out of the truck and threatening to kill her, he entered the truck and ordered her to drive to a remote area. Once there, he ordered Michelle to remove her clothes, began masturbating, and ordered her to masturbate as well. After orally copulating her, he vaginally raped Michelle. He then attempted to apologize, gave her $80 and crystal methamphetamine, and asked if he could call her. Quarles was charged with kidnapping, rape by force, oral copulation, and assault. He pled guilty to battery and was sentenced to two years' probation and 58 days in jail.

December 5, 1986: Jean awoke to find Quarles standing over her, putting a knife against her chest. He covered her face and said, "I can't meet people or communicate very easily. This is the only way I can get sex. This is the first time I've done this. Just be nice and I won't hurt you." When Jean attempted to prevent Quarles from tying a pillowcase around her head, she was cut by Quarles's knife. The cut required 15 stitches. Quarles told her he had been "watching [her] for a long time." He ordered her to take her

4

clothes off, and upon realizing she was bleeding profusely, attempted to wash her off and bandage her wound. They then sat on the bed and talked. She claimed to have recently had surgery such that a rape could paralyze her. Quarles responded, "If I can't have sex with you, why don't you wiggle my dick on you, and then you can suck me." Jean said no. He then asked, "Do you think you could really make love to me and enjoy it?" She responded in the negative to which Quarles replied, "I can't get out of this with nothing, so can I have your knives?" He left the residence with her knives and a door alarm. Upon leaving , he warned Jean, "Better watch yourself." For these actions, Quarles pled guilty to burglary under his plea agreement.

February 23, 1987: Sandra and Danny were a couple, who were spending the night in a motel. They had begun to have sex when Quarles emerged from within their motel room holding a large knife. He ordered Danny into the bathroom and instructed him to lock the door, stating, "I just want to fuck her." Danny complied. Quarles ordered Sandra to get down "on all fours" with her buttocks facing him. In response to her pleading, he allowed her to "sit on the edge of the bed and suck it." After forcing her to orally copulate him, he pushed her face down on the bed and ran the knife down the side of her leg. He again made her get on her hands and knees and vaginally raped her. After, he forced her to get on top of him and engage in vaginal sex on the bed. He suddenly became nervous and fled. Danny later told authorities that Quarles attempted to "get a hit man after us." Pursuant to his plea agreement, Quarles was convicted of burglary for these acts.

5

March 18, 1987:  Kathleen and her husband were staying at the same motel as Quarles's prior victims, Sandra and Danny.  Quarles entered the room while they slept, lifted the covers on the bed, and stared at Kathleen's body while indicating with a knife that she should be quiet.  He asked for money, but she had none.  He then fondled Kathleen's breasts, stomach, leg, and vagina.  When Kathleen's husband awoke, Quarles instructed him to cover his face with a pillow and go into the bathroom.  He then stole $350 from the husband's wallet and covered Kathleen's face with her sweatshirt.  Quarles pushed his penis into her mouth and forced her to orally copulate him for about five minutes.  He then vaginally raped her for five minutes.  After, Quarles instructed Kathleen's husband to come out of the bathroom and have sex with Kathleen.  After watching television for a while, Quarles told Kathleen to orally copulate her husband, which she did.  He then ordered the couple to "make love" but the husband could not get aroused.  Quarles commanded the husband to return to the bathroom and forced Kathleen to orally copulate him.  He subsequently vaginally raped her at knifepoint before masturbating and leaving.  For these actions, Quarles pled guilty to forcible rape with a knife as part of his plea agreement.  This was his first SVP qualifying offense.

September 12, 1987:  Cynthia and Kevin awoke in their bed to find Quarles standing in their bedroom yielding a large knife.  After informing them he was a "lunatic," he instructed Cynthia to make Kevin hard.  After Quarles threatened to cut Kevin, Cynthia complied and orally copulated Kevin for 45 minutes to an hour.  As Kevin was too afraid to get an erection, Quarles ordered the couple to "make out" for 15 minutes, and then Kevin orally copulated Cynthia while Quarles digitally penetrated her

6

vagina.  Quarles then vaginally raped Cynthia twice.  At some point during the ordeal, Quarles threw a $100 bill on the bed and told them, "This is for the show."  Cynthia threw the money back at him, to which he replied, "I'm not afraid to hurt you.  I'm mentally ill.  I've done this before."  The incident ended when Quarles threatened the victims with a two-inch revolver ("Don't yell or move and remember this") and left.  It was noted that he wore gloves during the incident and was concerned about fingerprints and physical evidence.  As part of his plea deal, Quarles was convicted of forcible rape with a knife for these actions.  This was his second SVP qualifying offense.

October 11, 1987:  Laurie returned to her home to find Quarles standing in her living room holding a large knife.  She approached him, grabbed the knife and said, "What the hell are you doing in my house?"  He broke free and fled out the front door.  For this event, he was convicted of burglary as part his plea agreement.

November 21, 1987:  As Ericka and Robert were having sex in their motel room, they looked up and saw Quarles in their room staring at them.  Holding a large knife in his hand, Quarles instructed them to "Keep on fucking because I want to [masturbate and] watch."  He commented that if they had been reading the newspapers they should have heard about him, and he would not hesitate to kill them.  Quarles informed them that if Robert did not have sex with Ericka then he would do it.  Robert told Quarles that he would kill Quarles if Quarles touched Ericka.  After taking their money and wiping doorknobs clean, Quarles left.  As part of his plea bargain, Quarles was convicted of robbery for this offense.

7

December 13, 1987: Quarles entered Christina's motel room under the guise that he was a motel employee and needed to fix clogged pipes. He later approached Christina, who was sitting in bed, with a knife and began to remove her clothes. He then forced her to orally copulate him. He then orally copulated her and asked her if she liked it before he vaginally raped her. He requested she make noises, which she did, and he ejaculated. Before leaving, he ascertained that she did not have "nothin' of value" and wiped down areas in the room that he had touched. This offense was also adjudicated with the plea bargain, and Quarles was convicted of the SVP qualifying offense of armed forcible rape.

January 4, 1988: Michelle, who was taking a shower, was surprised by a knife yielding Quarles standing outside the shower. He threatened, "Don't scream or I'll kill you." He asked for money. She offered him a bracelet to which he replied, "I don't want that. You know what I want." He forced her to remove her towel and sit on her bed. When her roommate Mary returned, he requested her money, which she gave him. He told Mary to undress, sit next to Michelle, and asked if they were lesbians. They informed him, "We're Catholics," and pointed out "all the crosses around here." When Michelle resisted his attempts to force her legs apart he threatened, "Do as I say or I'll kill you." Upon Michelle's further resistance, he moved onto Mary and fondled her vagina and rubbed his penis on her legs. All the while Mary, later joined by Michelle, repeated prayers out loud over and over. He suddenly told Michelle that "You should be more like [Mary]. She saved you," and left. As part of his plea deal, Quarles was convicted of burglary for these offenses perpetrated against Michelle and Mary.

8

January 23, 1988: Anna and her husband, D., had been sleeping in their motel room. Anna awoke to find Quarles lying on the floor near their bed. She woke up D., who yelled at Quarles to leave. Quarles brandished a knife and threatened to kill him if he moved. After demanding and taking their money, Quarles instructed the couple to "make love" and threatened that if the husband could not do it, he would. He also ordered them to engage in a specific sex act but they were too afraid. Quarles then made D. watch as he vaginally raped Anna while holding a knife to her throat. As part of his plea deal, Quarles was convicted of forcible armed rape for these actions. This was his fourth SVP qualifying offense.

February 8, 1988: Janice and John were engaged in sexual activity in their motel room when they realized Quarles was kneeling over them with a large knife. Quarles instructed them to keep quiet and continue performing. As the sun began to shine into the room, Quarles told Janice to shut the window or close the drapes. When she got up to do so, she escaped from the room and, while naked, flagged down a motorist who drove her to the California Highway Patrol station. Pursuant to his plea agreement, Quarles was convicted of burglary for these actions.

Before Quarles was to be released from prison, in 2014, the People filed a petition to have him civilly committed as an SVP within the meaning of the SVPA. In response to the People's petition, Quarles stipulated that he was an SVP. The superior court ultimately committed Quarles to the California Department of State Hospitals to undergo sex offender treatment for an indeterminate term of commitment. He then was sent to Coalinga State Hospital (CSH).

9

In September 2016, under section 6608, Quarles petitioned the superior court for his release through the Conditional Release Program (CONREP) for sex offenders, which is administered by Liberty Healthcare Corporation (Liberty).[2]  The People opposed his release.  The matter proceeded to trial in June 2018.

At trial, Quarles argued that he should be conditionally released because of his improvement while in prison and subsequently at CSH.  Specifically, Quarles became a devout Muslim, focused on overcoming his substance abuse problems, participated in hours of voluntary programs, and obtained certificates in a variety of different areas so he would have a means to earn a living once he was released from prison.  While at CSH, Quarles was a "model patient" who did not miss any treatment.

In support of his petition, Quarles testified on his behalf and took responsibility for his actions and stated that he would not sexually assault anyone if conditionally released.  He also testified that he understood why he committed his crimes as a young man in his 20's.

Dr. Frederick Winsmann, a clinical and forensic psychologist licensed in Massachusetts and New York, testified on behalf of Quarles.  Winsmann opined that, if conditionally released, Quarles was not likely to reoffend.

---

[2]     Throughout the record, the parties and the court referred to the possibility of Quarles being conditionally released to CONREP or Liberty CONREP.  At times, the parties and the court used the terms CONREP and Liberty CONREP interchangeably. From the context of the discussions in the record, it appears they were referring to CONREP as administered by Liberty.

Quarles also called as witnesses several individuals who treated him at CSH.  For example, Miguel Arellano, a behavior specialist at CSH, testified that Quarles's approach to treatment was "rare" because "he takes on treatment."  Clinical social worker Giovanna Buitrago discussed the many classes that Quarles completed.[3]  Buitrago explained that Quarles has good insight into his offending behavior.

Other witnesses testified favorably on Quarles's behalf.  Behavioral specialist Eliseo Garcia described Quarles as having a positive attitude and wanting to learn.  Charlotte Harder, a senior psychiatric technician, described Quarles as a model patient who does not exhibit any behavior issues.  Sergio Segasta, Quarles's substance abuse counselor, testified about the commitment Quarles has made and the group work he has participated in to show he is committed to remaining sober.  Behavioral specialist Lorraine Halonski testified regarding Quarles's commitment to treatment and completing his work.  Quarles had voluntarily participated in random drug tests, all of which were negative.

Also supporting Quarles's argument that he should be conditionally released was a written report by Dr. Carolyn Murphy, a psychologist.  After reviewing documents regarding Quarles's underlying offenses as well as his current treatment records, interviewing Quarles, and considering two recent polygraph examinations of Quarles,

---

[3]    These classes included exploring self-esteem, breaking barriers, DBT skills, interpersonal skills, building a better life, self-discovery, leading to empathy, values and actions, self-regulation problem solving, and positive decision-making.

11

Murphy indicated that she supported Quarles's petition for conditional release under CONREP.

In opposing Quarles's petition, the People relied on the opinion of Dr. Jeffrey Davis. Davis is a consulting psychologist at CSH. He wrote that Quarles meets the definition of an SVP. Specifically, Davis stated that Quarles suffers from a mental disorder and "will engage in sexually violent criminal behavior that makes him [a] danger to the health and safety of others such that further confinement in a secure forensic mental hospital is required." Davis also noted that Quarles had enrolled but had not completed the Department of State Hospitals Sex Offender Treatment Program.

In addition to relying on a written declaration by Davis, the People called Dr. Garrett Essres as a witness. Essres is a forensic psychologist who contracts with the Department of State Hospitals to provide annual evaluations. Essres testified that Quarles had been found to have a section 6600 qualifying sexual offense, has a mental disorder that predisposes him to commit criminal sexual acts, and is likely to pose a substantial danger as well as a well-founded risk of committing a future sex offense. Essres did not believe that Quarles could be adequately treated outside the confines of CSH. He believed a conditional release of Quarles would not provide the public with adequate protection from Quarles.

The People also called Dr. Cecilia Groman as a witness. Groman is the clinical director of Liberty and oversees CONREP. She opined that Quarles was not suitable for a conditional release. In support of her opinion, Groman noted, among other things, that Quarles had not completed his treatment at CSH.

12

After the close of evidence and listening to closing arguments, the court stated that Quarles had carried his burden and, thus, granted Quarles's petition for a conditional release. The court explained:

> "We are in murky waters here when we are trying to predict future behavior, and I do agree probably the best indicator we have is the past, but again, that may be damning faint praise, wish we had better predictors, but the present state of the profession is I think that we don't, though I do think the [petitioner carried] his burden of proof by the preponderance of the evidence that there is no doubt of the predicate offenses, there is no doubt in my mind that he suffers— currently suffers from one or more of the diagnosed mental disorders that the testimony has related to, and I think there is substantial well-founded risk of reoffending, but I think that risk can be adequately addressed in the CONREP program and honor basic core value of protecting public safety while giving him an opportunity, I think."

The court then ordered Liberty "to initiate the efforts to find a suitable placement" for Quarles, during which time Quarles would remain at CSH.

At a subsequent hearing, on October 12, 2018, the court considered public comment on the conditional release and placement of Quarles. The court ordered Quarles released to Liberty with a placement in a residence in Jacumba Hot Springs, California, on or about November 30, 2018. However, a few days after the October 12, 2018 hearing, a representative from Liberty informed counsel that placement was no longer available at the Jacumba Hot Springs residence. A new status conference was set for October 26, 2018.

Before the status conference, the People filed a motion to reconsider Quarles's conditional release and placement. At the October 26 status conference, off the record, the People informed the court that Quarles had failed two sexual history polygraph

13

examinations.[4]  The People stated that they learned this information from talking with Dr. Tricia Busby, chief of forensics at CSH.  The court then ordered an updated evaluation of Quarles, which was to be filed under seal.

An updated evaluation was provided by O'Sullivan in December 2018.  O'Sullivan conducted an extensive review of Quarles's records and an in-person interview of Quarles.  She concluded that Quarles could not be "safely released on a conditional basis at this time."  In support of her conclusion, O'Sullivan explained:  (1) Quarles possesses "a well above average risk of sexual recidivism"; (2) Quarles needs additional treatment at CSH, including completing module III; (3) the failed polygraph examinations indicate that Quarles had not been completely honest during his treatment and, as such, he did not receive adequate treatment to address his issues; (4) Quarles "has yet to fully understand and accept the extent and etiology of his sexual deviancy"; and (5) Quarles lacks sufficient insight into his mental disorders.

Although the record before us leaves much to be desired, it seems that the court held multiple evidentiary hearings regarding the People's motion for reconsideration.[5]  For example, there is a transcript for a hearing on July 25, 2019, in which the court heard

---

4     After the court granted Quarles's petition to be conditionally released, Quarles returned to CSH to await placement.  At that time, he took two polygraph examinations and was found to have been " 'Not Truthful' " in responding to certain questions.

5     The People have not cited to their motion to reconsider in the record.  We were not able to locate the motion during our independent review of the record.  However, we noted that Quarles's opposition to the motion to reconsider does appear to be in the record.  Based on the opposition, the court held a hearing on the People's motion on March 8, 2019.  However, there is no transcript of that hearing in the record.

14

testimony of two witnesses relating to Quarles's treatment at CSH. The People, however, do not explain the significance of these witnesses, if any, or otherwise explain why they included this transcript in the record but omitted transcripts of other hearing dates (the July 25 transcript clearly indicates that a witness testified on a previous date or time and additional testimony will be heard the following day).

On July 29, 2019, the court denied the People's motion to reconsider.

On September 18, 2019, the People filed a writ of mandate, asking this court to stay the superior court's order to release Quarles and issue orders to (1) keep Quarles in CSH; (2) release subpoenaed records related to Quarles's polygraph examinations; and (3) direct the superior court to keep all hearings in this matter open to the public. We requested an informal response to the petition from Quarles and stayed the superior court's order granting Quarles a conditional release.

On September 30, 2019, Quarles filed an informal response, urging this court to deny the People's petition. We subsequently issued an order to show cause and maintained the stay on the superior court's order. On November 1, 2019, Quarles filed a return, and on December 9, 2019, the People filed a reply.

DISCUSSION

I

THE SUPERIOR COURT'S GRANTING OF QUARLES'S PETITION FOR
CONDITIONAL RELEASE

A.  The People's Contentions

The People contend the superior court applied the wrong standard in granting

Quarles's petition to be conditionally released under section 6608 of the SVPA.

Specifically, they emphasize the court's multiple references to finding the "least

restrictive setting" for Quarles and argue that the "least restrictive setting" should not

have been part of the court's analysis below.

B.  SVPA Proceedings for Conditional Release

We previously summarized proceedings for conditional release under section 6608

of the SVPA in *People v. Collins* (2003) 110 Cal.App.4th 340 (*Collins*).

"Because the SVPA is designed to ensure a committed person does not remain

confined any longer than he or she qualifies as a sexually violent predator, it provides

means for that individual to obtain review of his or her mental condition to determine if

civil confinement is still necessary.  [Citation.]  One of two ways such review may be had

is by petition for conditional release before expiration of the committed person's two-year

term of commitment under section 6608.  [Citations.]"  (*Collins*, *supra*, 110 Cal.App.4th

at p. 346, fn. omitted.)

"Conditional release proceedings can be initiated by the DMH [California

Department of Mental Health] if it 'determines that the person's diagnosed mental

16

disorder has so changed that the person is not likely to commit acts of predatory sexual violence while under supervision and treatment in the community.' (§ 6607, subd. (a).) But absent the DMH's recommendation, the committed person can petition the court for conditional release any time after one year of commitment. (§ 6608, subd. (c).) Section 6608 subdivision (a) provides: 'Nothing in this article shall prohibit the person who has been committed as a sexually violent predator from petitioning the court for conditional release and subsequent unconditional discharge without the recommendation or concurrence of the Director of Mental Health. If a person has previously filed a petition for conditional release without the concurrence of the director and the court determined, either upon review of the petition or following a hearing, that the petition was frivolous or that the committed person's condition had not so changed that he or she would not be a danger to others in that it is not likely that he or she will engage in sexually violent criminal behavior if placed under supervision and treatment in the community, then the court shall deny the subsequent petition unless it contains facts upon which a court could find that the condition of the committed person had so changed that a hearing was warranted. Upon receipt of a first or subsequent petition from a committed person without the concurrence of the director, the court shall endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds and, if so, shall deny the petition without a hearing. The person petitioning for conditional release and unconditional discharge under this subdivision shall be entitled to assistance of counsel.' " (*Collins*, *supra*, 110 Cal.App.4th at pp. 346-347.)

17

"Before acting on a petition for conditional release under section 6608, subdivision (a), the superior court must first obtain the written recommendation of the director of the treatment facility to which the person is committed. (*Id*., subd. (j).) The court reviews the petition in order to 'determine if it is based upon frivolous grounds,' and if it so finds, it 'shall deny the petition without a hearing.' (*Id*., subd. (a).) Section 6608, subdivision (b) provides: 'The court shall give notice of the hearing date to the attorney designated in subdivision (i) of Section 6601, the retained or appointed attorney for the committed person, and the Director of Mental Health at least 15 court days before the hearing date.' " (*Collins*, *supra*, 110 Cal.App.4th at p. 347.)

"Section 6608, subdivision (d) provides in part: 'The court *shall hold a hearing* to determine whether the person committed would be a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community. If the court . . . determines that the committed person would not be a danger to others due to his or her diagnosed mental disorder while under supervision and treatment in the community, the court shall order the committed person placed with an appropriate forensic conditional release program operated by the state for one year.' (Italics added.) 'At the end of one year, the court shall hold a hearing to determine if the person should be unconditionally released from commitment on the basis that, by reason of a diagnosed mental disorder, he or she is not a danger to the health and safety of others in that it is not likely that he or she will engage in sexually violent criminal behavior. The court shall not make this determination until the person has completed at least one

18

year in the state-operated forensic conditional release program.' (*Ibid.*)"  (*Collins*, *supra*, 110 Cal.App.4th at p. 347.)

### C.  Analysis

Here, the Director of State Hospitals did not recommend that Quarles be conditionally released.  Thus, Quarles had the burden of proof to show that he would not be a danger to others due to his diagnosed mental disorder while under supervision and treatment in the community.  (See § 6608, subds. (a), (g).)  During the trial on Quarles's petition, a dispute arose regarding the type of finding required before Quarles could be conditionally released.  Quarles's attorney argued, "[T]he thing is . . . that the law says that somebody should be released when there is a least restrictive alternative available, not when somebody completes a program in its entirety."  The court appeared to agree, noting, "I think the key line is least restrictive."

Later during the hearing, Quarles's attorney reiterated the importance of the court finding the least restrictive setting:  "And so if there is a leas[t] restrictive alternative, the Court has to place him there if they believe by a preponderance of the evidence that he has proven his suitability."

The court subsequently asked the People to address the least restrictive language: "What do you make of counsel's language, she quoted that the Court has to decide whether the hospital is the least restrictive setting in which to . . . .  Aren't I bound to decide what's the least restrictive confinement or setting to guarantee the protection or provide some acceptable measure of protection of the public?"  The People responded that "the hospital is the least restrictive way to keep the community safe."  The People

19

further explained the danger of conditionally releasing Quarles before he was able to complete module three of his treatment at CSH: "Well, once he gets out into the community, we are going to see how he does, but until we give him module three, which gives him the type of practical applications of applying the type of thing that he learned in module two, we are not putting him in the best position."

The court responded to the People's statement, emphasizing the importance of finding the least restrictive setting for Quarles. The court stated:

> "CONREP can't provide that [module three training]? I mean, they'd rather not, I do understand, but that's not the design of CONREP and they—rather they very strongly prefer that he finish phase three, but I'm not sure that under the law, again, the notion of least restrictive setting, I'm not sure that—how I should take that into account. I mean, I understand it's not ideal, but CONREP constantly deals with situations that are not ideal, I think, and they are prepared to do so, I think, particularly in this case.

> "I mean, he knows he is going into not a welcoming certainly out in the community, probably assuming he did at the hands with his fellow inmates in prison, so he's not—going into a very unwelcoming atmosphere in the community at large, but also CONREP understands that he didn't complete what they wish he had completed, and so it's going to fall on them to hopefully be able to provide the same safeguards that—complete in phase two, and I think—I mean, at the very least, if he doesn't complete two, then if that's called to the Court's attention, I certainly would take that into account.

> "But if he gets into at least kind of phase three, CONREP I think knows that he hasn't gone as far as they would like him to have gone, and they are going to accept the responsibility of making sure whether he does basically complete the equivalent of phase three."

The People then reminded the court that a representative of Liberty testified that CONREP's purpose is not to provide recovering SVP's with module three training, and

20

the court agreed: "I understand that. Like I said, this is not ideal, this is not the design of CONREP." However, the court indicated that "the real crux here is whether the hospital is the least restrictive—preponderance of the evidence shows that the hospital is the least restrictive setting to provide the required public safety . . . . [¶] . . . I think the burden is—the question is, is the hospital the least restrictive setting?"

The People later questioned the court's focus on finding the least restrictive setting, observing the "language" "least restrictive placement doesn't appear in the statute." After a recess, the court explained that the least restrictive setting language was neither in the statute nor case law, but was implied in the statute and supported by case law (although not expressly stated).[6] The court therefore found that Quarles should be conditionally released although it concluded he suffered from at least one diagnosed mental disorder and he had a "substantial well-founded risk of reoffending."

We agree with the superior court that the instant matter was a "close call," and we acknowledge that the court worked diligently to consider the evidence and render its conclusion.[7] We, however, are concerned that the court applied the incorrect legal standard by looking for the least restrictive setting in which to place Quarles without due consideration for public safety. Such a standard essentially adopted Quarles's argument

---

6 In contending the court must find the least restrictive placement for Quarles, Quarles's attorney relied on *People v. LeBlanc* (2015) 238 Cal.App.4th 1059. The court noted that *LeBlanc* was not "binding precedent" because that case involved whether the trial court abused its discretion in finding a petition for unconditional release was frivolous. (See *id.* at p. 1062.) Nevertheless, the superior court here found the case "include[d] some instructive language, I think."

7 The superior court took 50 pages of notes during the trial on this matter.

21

below wherein his attorney asserted Quarles should be released where there is "a least restrictive alternative available." Here, Quarles has not provided any case law in which a court held that it must find the least restrictive setting in which to release an SVP. Instead, Quarles now argues the phrase "least restrictive setting" is unimportant and "a conditional release is just" the least restrictive setting. However, such an argument is belied by Quarles's attorney's emphasis that the court must find the least restrictive setting below. It begs the question that if the "least restrictive setting" was merely an alternative way to state "conditionally release" why the parties and the court engaged in substantive discussion of the subject phrase and how it factored into the conditional release proceeding. And, again, this argument appeared to be adopted by the superior court as it referenced "least restrictive setting" repeatedly.

The parties have not cited to any case that requires a superior court to specifically determine the least restrictive setting in which to place an SVP. Instead, section 6608, subdivision (g) sets forth the appropriate considerations for the superior court: "The court shall hold a hearing to determine whether the person committed would be a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community. . . . If the court . . . determines that the committed person would not be a danger to others due to his or her diagnosed mental disorder while under supervision and treatment in the community, the court shall order the committed person placed with an appropriate forensic conditional release program operated by the state for one year. . . ." (§ 6608, subd. (g).) As another appellate court summarized:

22

"Under the provisions of the SVPA, a person committed as an SVP can be conditionally released *only* upon a determination by a court of law that the person will pose *no danger* to others if under outpatient supervision and treatment in the community. That means that in every case in which conditional release is permitted, it has been determined that the person released into the community *will not be* an SVP when provided with proper supervision and treatment." (*People v. Superior Court* (*Karsai*) (2013) 213 Cal.App.4th 774, 779 (*Karsai*).)

In the instant matter, the superior court found that Quarles suffers from one or more diagnosed mental disorders and there exists a "substantial well-founded risk of reoffending," but opted to conditionally release him into CONREP because the risk of reoffense "can be adequately addressed in the CONREP program." The court also stated that the conditional release would give Quarles an "opportunity." We note that the court reached this opinion over the strenuous opposition of the People as well as evidence that the director of Liberty and the consulting psychologist of CSH opined that Quarles should not be conditionally released. In addition, there was considerable discussion at trial that Quarles had not yet completed module three of his training at CSH and would have to do so once released into CONREP. Although it is the purview of the superior court to assess the evidence before it, make credibility findings, and draw appropriate inferences from the evidence presented, we are concerned that the court evaluated the evidence through an improper lens- one that mandated that the court find the least restrictive setting in which Quarles could receive treatment without sufficient consideration of public safety. Such a consideration is especially important considering Quarles's violent past.

23

Further, the court admitted this case was a "close call." It also acknowledged "this was a difficult decision. . . . I think [I] would not have been abusing my discretion if I had not granted [Quarles's] conditional release." Considering the heinous and vicious nature of Quarles's past crimes, we believe it prudent to ensure that the superior court applied the correct standard in analyzing Quarles's petition for conditional release.

Additionally, we are disquieted by some of the court's explanation in support of its findings, indicating that the superior court may have had doubts as well. For example, almost immediately after stating that Quarles should be conditionally released, the court lamented:

> "I hope we are not setting him up for failure, but I guess under the law if he satisfies the basic requirements, he has a right to set himself up for failure, if that's the ultimate conclusion, I don't believe he is setting himself up for failure. I don't know how optimistic I am in that regard, but I think he has earned the right to take the next step, and I'll say in my old experience, I am impressed with the diligent professional manner in which CONREP will manage him in the community, and I have no doubt that if they think he is not honestly truly engaging and/or has directly violated any of the conditions of his release, which are very restrictive, very difficult, they will immediately notify the hospital, they will notify the sheriff and notify the court."

These comments give us pause. The superior court expressed concern that conditionally releasing Quarles might be setting him up for failure. Failure, after being conditionally released, would be devastating not only for Quarles but, more importantly, for the public. Quarles is a serial rapist whose crimes were shockingly brutal and destructive. If he fails after he is conditionally released, considering his past, we shudder to contemplate the consequences of such a failure. This is not a risk the superior court

24

should place on the public. (See *Karsai*, *supra,* 213 Cal.App.4th at p. 779 ["a person committed as an SVP can be conditionally released *only* upon a determination by a court of law that the person will pose *no danger* to others if under outpatient supervision and treatment in the community"].) And although the court later indicated that it did not believe Quarles was setting himself up for failure, the court's follow up comments make it clear it is CONREP in which the court has placed its faith, not Quarles ("I am impressed with the diligent professional manner in which CONREP will manage him in the community"). However, we note that the director of Liberty told the court that she does not believe Quarles should be conditionally released. Moreover, there is evidence in the record that Liberty typically does not provide individuals with the type of module three training Quarles still requires.

We appreciate the difficult task that the superior court faced in this matter. We do not doubt the court's diligence or desire to reach the correct and fair result. However, based on the record before us, we simply have too many concerns that the superior court applied the incorrect legal standard. As such, the sensible course here is to grant the requested relief, remand this matter back to the superior court with instructions to vacate

25

its order granting Quarles's petition for conditional release, and allow Quarles to file a new petition under section 6608 if he chooses to do so.[8]

## II

## THE PEOPLE'S OTHER CONTENTIONS

The People raise three other issues in their petition and request separate relief as to each issue. As we explain below, we determine none of these remaining issues has merit and thus deny relief as to each of them.

### A. Substantial Evidence

In their petition, the People make a substantial evidence challenge to the superior court's order granting Quarles's conditional release. As such, they contend: "A review of the evidence presented to the trial court shows that substantial evidence supports continued confinement and not the trial court's release order." This is not a substantial evidence challenge. Instead, the People simply argue that the evidence weighs more

---

[8] In his return, Quarles argues that because the People did not assert that his petition for conditional release was frivolous, they "in essence conceded that his treatment was sufficient for consideration of a conditional release and that his petition for conditional release was meritorious." However, Quarles cites no authority to support his position. When a petitioner files a petition for conditional release without the concurrence of the Director of State Hospitals, the court must first determine if the petition is frivolous. If the court finds it frivolous then it shall deny the petition without a hearing. (§ 6608, subd. (a).) Here, before the trial, the People pointed out that the court had to make a determination whether Quarles's petition for conditional release was frivolous. The court engaged in such analysis and found that the petition was not frivolous. The court's finding did not prohibit the People from challenging Quarles's petition.

26

heavily in favor of their desired outcome.  In other words, they ask this court to reweigh the evidence and come to a different conclusion than the trial court.  This we cannot do.

A substantial evidence standard of review does not involve an appellate court reweighing evidence or substituting its judgment for that of the trial court.  (See *People v. Clark* (2000) 82 Cal.App.4th 1072, 1082-1083.)  Under the substantial evidence standard of review, "the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]  The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' "  (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261, italics omitted.)

We "must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  "We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . ."  (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)  Further, "[a]lthough we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the

27

fact finder." (*Jones*, at p. 314.)  This is true even in the context of expert witness testimony.  "The credibility of the experts and their conclusions [are] matters [to be] resolved . . . by the jury," and "[w]e are not free to reweigh or reinterpret [that] evidence." (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466-467.)

Here, the People do not lay out the evidence in a light most favorable to the judgment and then explain why the superior court's conclusions are not supported by the evidence.  Instead, they slant the evidence to support their position.  They omit portions of the record that would be necessary to conduct a substantial evidence review.  This is improper.  An appellant must provide a record that allows for meaningful review of the challenged order.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*).)  If the record does not include all of the evidence and materials the trial court relied on in making its determination, we will not find error.  (*Haywood v. Superior Court* (2000) 77 Cal.App.4th 949, 955.)  Rather, we will infer substantial evidence supports all of the court's findings.  (*Ibid.*)  As such, on the record before us, we must reject the People's substantial evidence challenge.

## B.  Polygraph Evidence

### 1.  Background

After the court ruled that Quarles was to be conditionally released, Quarles returned to CSH to await Liberty finding him an appropriate placement in the community.  While awaiting his conditional release, Quarles participated in two sexual history disclosure polygraph examinations.  Before the first examination, he prepared a sexual offender disclosure questionnaire.  In that questionnaire, he indicated that he had

28

raped a total of seven female victims under threat of knife. He stated he was arrested for and charged with three offenses; thus, his questionnaire response indicated four previously undisclosed crimes.

During the first polygraph examination, he was asked the following questions: (1) Since turning 18, have you had sexual contact with anyone you did not disclose; and (2) Have you forced or threatened anyone else to have sex with you that you did not disclose. Quarles responded " 'No' " to both questions; however, the results of the polygraph indicated that he was " 'Not Truthful.' "

Before his second sexual history polygraph examination, Quarles revised his sex offender disclosure questionnaire to include a total of 14 rape or attempted rape victims. He also indicated that he " 'peeped on so many women that [he could not] give an honest number because peeping was a common practice [he] did for many years.' " He then participated in the second sexual history polygraph and responded " 'No' " to the following two questions: (1) Other than what you have told me, have you used any other weapons on someone for sexual contact; and (2) Have you forced or threatened anyone else to have sex with you that you did not disclose. Results from the second polygraph indicated that Quarles was " 'Not Truthful.' "

These two sexual history polygraph examinations were discussed in great detail in an SVP progress report dated December 18, 2018, prepared by O'Sullivan on behalf of the California Department of State Hospitals.

After the People discovered that Quarles had taken these two polygraph examinations, they served CSH with a subpoena duces tecum "to essentially get any

29

documents that Dr. O'Sullivan had relied upon for the supplemental evaluation."[9]  The

People represented that they wanted the polygraph examinations as well as any notes

memorializing what Quarles had told the individual administering the polygraph

examinations.

Apparently, responsive documents were sent to the court so it could review the

requested documents in camera.  The court explained during a February 14, 2019 status

conference:

> "All right.  We continued the matter to this date and time so the
> court could review en camera certain records that were forwarded to
> the court from the Coalinga State Hospital legal records unit
> pursuant to a subpoena duces tecum issued by the Office of the
> District Attorney, and I have done so.

> "I noted with interest as you may have also noted if you had access
> to that document, I'm not sure whether you did or not, but the
> affidavit from the correctional case records supervisor at the
> Department of State Hospitals Coalinga affirms that she is the
> custodian of the records, which are the subject of the subpoena duces
> tecum, but in particular, I noticed item 3—first of all, she identifies
> herself as the custodian and that the copies transmitted are true and
> correct copies of all the original records.

> "But of most significance, I think, is item 3 of the records described
> and she is referring to the description in the subpoena duces tecum.

> "Of the records described, this agency does not have the following
> records:  sex offender disclosure questionnaire completed by Alvin
> Quarles prior to the 30 July 2018 polygraph; second item sexual
> offender disclosure questionnaire completed by Alvin Quarles dated
> 3 August 2018 for a polygraph on or about that date; and lastly, any
> notes made by Dr. C. O'Sullivan in preparation of a sexually violent
> predator progress report dated 18 December 2018.

---

9    The People have not cited to the subject subpoena duces tecum in the record.
During our review of the record, we did not find the subpoena.

30

"And it seems reasonable to imagine that those may have been the primary items of interest that prompted the subpoena duces tecum.

"So with that preamble, I have reviewed the records, not in great detail, but the vast majority of the records are on state hospital department forms that have the heading—let me get it here so I correctly state it—nursing notes, and their daily, weekly reports of the fairly routine matters in connection with his presence there at the hospital."

Despite the court's description of the documents as routine and not particularly probing of the issues before it, the court did indicate that there was a report about at least one of the polygraph examinations. The court explained that the report stated the examiner believed Quarles was not being truthful in responding to two questions and set forth the specific questions on the record.

Quarles's attorney argued that the polygraph results should not be released to the People because they were privileged under the psychotherapist patient privilege (Evid. Code, §§ 1010, 1011, 1013) and Welfare and Institutions Code section 5328. Counsel also represented to the court that Quarles agreed to take the two polygraph examinations when requested by Liberty only after his counsel was assured that the results of the examination would not "be used against him in any way."

In response, the People argued that documents related to the polygraph examinations would be important to show a changed circumstance that should persuade the court Quarles should not be conditionally released. However, the court asked the People to focus on the issue of whether the documents should be produced, not how they would be used in trial. Yet, the court indicated that, to the extent O'Sullivan relied on the

31

polygraph examinations to prepare her report, the parties would be allowed to discuss those examinations in questioning her if she testified.

The People then reiterated that they believed they had a right to the documents relating to the two polygraph examinations:

> "Well, I think that both parties should have access to these records because the aim of the SDT was to get after what Dr. O'Sullivan had reviewed in preparation for her evaluation, and so both sides should have access to that information in order to conduct a full hearing about what Dr. O'Sullivan's opinion is."

Ultimately, the court released the documents to Quarles's attorney "for her further review" to allow her to "indicate whether she thinks the prosecution ought to have them or not." The People do not point to anywhere in the record showing what was eventually produced to them or whether Quarles's attorney prevented certain documents from being produced. They do, however, represent that "the trial court denied the People access to those subpoenaed records, thus preventing the People from admitting those subpoenaed polygraph test results into evidence for the trial court's consideration while it determined Quarles'[s] risk of sexually reoffending while in the community."

The People do not point to any order in the record stating that the People could not discuss the polygraph examinations while examining any witness during the evidentiary hearing. Quarles does not quibble with the People regarding this claim. But during the cross-examination of Dr. Carolyn Murphy at an evidentiary hearing on July 25, 2019, the court allowed the People to question her about a failed polygraph examination over the objection of Quarles's counsel. When Quarles's counsel again complained that the court

32

had ruled that evidence of the polygraph examinations was to be excluded, the court and

Quarles's counsel engaged in the following exchange:

> "THE COURT:  Probing the basis for her opinions, and that is proper here.  Let's move on, Counsel.  I never said, oh, you can't mention polygraph at all, remove it from the courtroom.  I never made that ruling.  That's one of the reasons we're out of the presence of the public I think is because this is privileged, confidential information.
>
> "[QUARLES'S COUNSEL]:  I maybe misunderstood, but I thought the Court's ruling was that there was going to be no information given and considered in relation to the results of the polygraph.
>
> "THE COURT:  No, you misunderstood then.  All right.  Let's move on."

The parties then indicated their confusion regarding what could be mentioned about the polygraph examinations during the evidentiary hearing.  In response, the court explained:

> "The polygraph is not the cornerstone of my decision here.  I'm going to state on the record when I announce my decision I don't care about the polygraph.  That's not the basis for my decision.  It's a piece of the evidence here, but that's not the cornerstone or the lynchpin of my decision."

The court later appeared to express its exasperation regarding the parties' focus on the polygraph examinations:

> "Beating this to death here.  Tail wagging the dog here.  I think a fair understanding of some of the testimony in the reports is that they would have the same opinion with or without that polygraph.
>
> "Obviously it hasn't changed the opinion of those people who still think he's not—that CONREP is not the least restrictive appropriate commitment at this point.  It hasn't changed their opinion.  Not too surprisingly, I suppose.  It's not a plus for him, but that's not going to be the basis of my decision.  I can assure you that."

33

## 2. Analysis

Here, the People raise two issues regarding the polygraph evidence. First, they argue the court erred in denying them access to the subject documents. Generally, the standard of review for discovery orders is abuse of discretion. (*People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51, 156.) However, it is unclear from the record what they specifically subpoenaed and what was produced. It appears the People were most interested in O'Sullivan's notes regarding what Quarles told her about the polygraph examinations. Yet, the court indicated that there were no such documents produced to the court for its in camera review. If these are the records that the People were seeking, but there were no responsive documents to produce to them, there could be no abuse of discretion because the people cannot show they were prejudiced by the court's alleged order. (See *City of Los Angeles v. Superior Court of Los Angeles County* (1961) 196 Cal.App.2d 743, 748 [" 'Abuse of discretion' in allowing or denying discovery is synonymous with 'resulting prejudice.' If there is no proof of resulting prejudice, abuse of discretion is not shown."].)

Moreover, without an additional description regarding what the People subpoenaed from CSH, what CSH produced, and what the court order produced, if anything, we cannot evaluate whether the court abused its discretion regarding this discovery issue. "[A]n 'order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' [Citation.]" (*Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 718, quoting *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) Accordingly, "[i]t is well settled . . . that a

34

party challenging a judgment has the burden of showing reversible error by an adequate record." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574.) "Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant]. [Citation.]" (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502.) Without a more complete record, we cannot possibly determine whether the superior court abused its discretion in allegedly denying the production of documents to the People.

The People's second contention regarding the polygraph evidence is that the court abused its discretion in excluding that evidence during the evidentiary hearing. (See *People v. Griffin* (2004) 33 Cal.4th 536, 587 ["a trial court's ruling on the admissibility of evidence generally is reviewed for abuse of discretion."].) Again, we are somewhat at a loss to understand the scope of the challenged ruling. Here, the parties seem to agree that the court made a ruling prohibiting reference to the polygraph examinations to some extent during the evidentiary hearing concerning the People's motion for reconsideration. Nevertheless, the parties have not cited to the specific order or the transcript of the hearing at which the ruling was made. Nor do we have the complete transcript of the evidentiary hearing. And, during the cross-examination of one witness, the People were allowed to broach the topic of at least one of the polygraph examinations. Further, O'Sullivan's report, which is in the record, discussed extensively the two subject polygraph examinations. Also, the polygraph examinations were considered in the Department of State Hospitals-Coalinga Annual Evaluation of Quarles dated May 17, 2019. Despite the lack of clarity in the petition on this issue as well as the somewhat

35

muddled state of the record, it is clear the court was aware of the two sexual history polygraph examinations and the opinion that Quarles had been found not truthful in both of them. As such, the People have utterly failed to frame, with appropriate citations to the record, the precise order or ruling they claim the court abused its discretion in making. Put differently, we cannot ascertain, on the record before us, the extent to which the parties could reference the polygraph examinations during the evidentiary hearing.

Moreover, even if we were to assume the court abused its discretion in excluding the polygraph evidence, the People's challenge would nonetheless fail. The erroneous exclusion of evidence is reviewed for prejudice under the standard described in *People v. Watson* (1956) 46 Cal.2d 818, 836. If error is shown, the petitioner must further demonstrate a reasonable probability that he or she would have obtained a more favorable outcome had the error not occurred. (*Ibid.*; *People v. Earp* (1999) 20 Cal.4th 826, 880.) On the record before us, the People cannot satisfy this burden. The superior court, which was the trier of fact, made abundantly clear, on the record, that the polygraph examinations were not major factors in its final decision. Indeed, the court stated the polygraphs would not be "the cornerstone" of its decision; it did not care about the polygraphs; the polygraph examinations would not be "the basis for [the court's] decision"; and the polygraphs were not the "the lynchpin of [its] decision." Against this backdrop, the People simply cannot show any prejudice from the exclusion of the polygraph evidence.

36

C. Whether The SVP Proceedings Should Have Been Open to the Public

The People represent in their petition that "some of Quarles'[s] victims wanted to be present during *all* the proceedings to hear the evidence." (Italics added.) The People further contend that the "trial court's sealing and closure order prevented the victims [*sic*] right to access the proceedings without a rational basis and with a result violative of the victims' rights." In support of their position, the People refer in general to exhibit M filed in support of their petition.

Ironically, exhibit M is a reporter's transcript of an October 12, 2018 hearing, which was open to the public. At that hearing, among other things, the court heard members of the public comment on the proposed conditional release of Quarles. The court also read into the record certain letters it had received from concerned members of the public regarding Quarles's proposed conditional release. Thus, exhibit M, does nothing to advance or support the People's position.

If the People had merely misidentified the actual exhibit or exhibits that set forth the court's ruling excluding the public from all proceedings involving Quarles's petition to be conditionally released, we would overlook that mistake and reach the merits. But our review of the record does not support such an approach.

In their petition, the People refer to SVPA proceedings in general and argue that the public should have been entitled to attend all proceedings. They do not differentiate between the various proceedings below, which included a trial, evidentiary hearings, motion hearings, and status conferences. They do not explain what occurred at any of the proceedings. They do not cite to any order prohibiting the public from attending any

37

specific hearing.  They do not cite to any motion or opposition filed by the parties in the superior court regarding the closing of any hearing to the public.  The People fail to indicate whether any proceeding below was open to the public.  Instead, they leave it to this court to comb through the record to ascertain what occurred and whether there was error.  This is not our role.  (See *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1.)

Based upon our review of the record, it appears there were several proceedings in the superior court relating to Quarles's petition for conditional release.  Some were open to the public; others were not.  For example, the trial on Quarles's petition occurred in May and June 2018.  There is no order in the record excluding the public from the trial. To the contrary, in a filing with the superior court, the People represent that "[t]he entire trial . . . was open to the public."  Therefore, it appears the court did not prohibit the public from attending the trial on Quarles's petition for conditional release.

Although not cited by the People, Quarles moved to close a March 8, 2019 hearing to the public and the media and filed another motion to exclude media television coverage of the same hearing.  The People opposed those motions.  There does not appear to be any order in the record granting Quarles's motions as to a March 8, 2019 hearing.  Also, there does not appear to be a transcript of a March 8, 2019 hearing in the record.

Yet, it seems from an order dated August 1, 2019, the court determined that several proceedings would be closed to the public.  In the August 1 order, the court allowed the parties to have access to certain sealed transcripts for purposes of "seeking

review in a higher court." In that order, the court stated it "previously made findings that the proceedings conducted on February 14, 2019, March 8, 2019, March 20, 2019, May 10, 2019, May 31, 2019, June 21, 2019, and July 23-29, 2019 be closed to the public." Thus, it appears the superior court ruled that the public could not attend several proceedings relating to Quarles's petition for conditional release.

The record also contains a transcript of a hearing that occurred on May 31, 2019. Although there was some confusion among the parties and the court regarding what issues were to be decided then, ultimately the court addressed whether the public would be excluded from an evidentiary hearing involving the People's motion for reconsideration. In addressing that issue, the court stated that it would not make any "blanket exclusion" of the public, but remained concerned that "the evidentiary hearing [was] for the most part going to deal with evidence that I don't think the public has the right to. It violates [Quarles's] privacy interests and to some extent it may involve information that is within . . . [section] 5328, which is pretty broad."

After entertaining argument from the parties, the court reiterated that the public would not necessarily be excluded from all hearings going forward:

> "It's only if we are going to be discussing what I think is privileged information. They are welcome to be here when I announce—that I have reconsidered it, we have had extensive hearings, and here is the result and my reconsideration. I'm not going to exclude them from that. All we are doing today is continuing—making my evidentiary ruling and then setting the case for future hearing. I just don't think the public's right to be here is severely damaged by not having them here at the moment."

39

In summary, it appears the court allowed the public to attend the trial on Quarles's petition for conditional release. Further, the public was permitted to address the court regarding the court's original decision to conditionally release Quarles. However, the court found that the public should not attend hearings that occurred on February 14, 2019, March 8, 2019, March 20, 2019, May 10, 2019, May 31, 2019, June 21, 2019, and July 23-29, 2019. We know from our independent review of the record that on May 31, 2019, the court and the parties addressed evidentiary issues as well as whether the public would be excluded from future hearings. That said, the People have not explained what occurred at any of the other closed hearings and why as to those specific hearing dates the public should have been permitted to attend.

As best we can glean from their arguments in the petition here coupled with their limited citation to the record in support of their position, the People contend that once an individual seeks a conditional release under section 6608, he or she loses any privacy rights regarding his or her medical records. Alternatively stated, the public has an absolute right to attend all proceedings brought under section 6608. However, the People do not cite any authority to support their desired rule.

As noted by the People, the only California case that addressed public access to an SVPA hearing is *People v. Dixon* (2007) 148 Cal.App.4th 414 (*Dixon*). In that case, the court observed there was no statute addressing public access to proceedings under the SVPA. (*Dixon*, at p. 427.) And, although the court reasoned that the Legislature was "better equipped" to "formulate a rule concerning public access in SVPA proceedings," (*id.* at p. 430), it noted "a compelling basis for arguing that involuntary civil commitment

40

proceedings under the SVPA are not ordinary civil proceedings that must be open to the public[]" (*id.* at p. 429). Thus, absent a statute by the Legislature specifically addressing whether the public has the right to attend all SVPA proceedings, the court in *Dixon* implies it would be within a court's discretion to exclude the public from certain SVPA proceedings. The People offer no contrary legal authority, and for the reasons discussed in *Dixon*, we agree that a case-by-case approach is best at this time. (See *Dixon*, at pp. 424-430.)

Moreover, we do not believe this is the optimum case to address this novel issue. We presume that a judgment or order of the trial court is correct. (*Denham*, *supra*, 2 Cal.3d at p. 564; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 822.) Demonstration of error alone, however, is insufficient to warrant reversal. An appellant must also demonstrate prejudice, in the form of a miscarriage of justice, based on an examination of the entire record. (*In re Marriage of Falcone & Fyke*, at pp. 822-823.) "A necessary corollary to this rule would seem to be that a record is inadequate, and appellant defaults, if the appellant predicates error only on the part of the record he provides the trial court, but ignores or does not present to the appellate court portions of the proceedings below which may provide grounds upon which the decision of the trial court could be affirmed." (*Uniroyal Chemical Co. v. American Vanguard Corp.* (1988) 203 Cal.App.3d 285, 302.)

A party appealing an adverse judgment has the burden of providing an adequate record in order to show error and prejudice. (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 186-187; *Hernandez v. California Hospital Medical Center*,

41

*supra*, 78 Cal.App.4th at p. 502.) "We cannot presume error from an incomplete record." (*Christie v. Kimball* (2012) 202 Cal.App.4th 1407, 1412.) If the plaintiff fails to provide an adequate record to support a claim, the issue must be resolved in the respondent's favor. (See *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295-1296.)

In the instant matter, the superior court did not prohibit the public from attending all proceedings below. Instead, it kept some proceedings open to the public and closed others. The People do not adequately explain what occurred at the proceedings that were closed to the public. Further, there are no citations to the record referring us to what occurred at the closed hearings. Simply put, the People's arguments and the record before us are inadequate to allow us to reach the merits of this issue. (See *Maria P. v. Riles*, *supra*, 43 Cal.3d at pp. 1295-1296; *In re Marriage of Falcone & Fyke*, *supra*, 164 Cal.App.4th at pp. 822-823; *Uniroyal Chemical Co. v. American Vanguard Corp.*, *supra*, 203 Cal.App.3d at p. 302.) We therefore deny the petition as to the People's claim that the court erred in excluding the public from certain proceedings under the SVPA.

## DISPOSITION

We grant some of the requested relief. The superior court is to vacate its order granting Quarles a conditional release under section 6608 without prejudice to Quarles filing a new petition. We deny the People's requested relief regarding: (1) their substantial evidence challenge; (2) their claim the court erred in excluding the polygraph evidence; and (3) their claim the court improperly prohibited the public from some of the

42

SVPA proceedings. We offer no opinion as to whether Quarles should be conditionally

released should he choose to file a new petition under section 6608.


HUFFMAN, Acting P. J.

WE CONCUR:



HALLER, J.



O'ROURKE, J.

43